William P. LOWNEY, Plaintiff,

v.

**GENRAD, INC., and The Genrad Committee on Employee Benefit Plans, Defendants.**

**CA No. 94–10304–JLT.**

United States District Court, D.Massachusetts.

Dec. 19, 1995.

Emanuel Howard, Boston, MA, for William P. Lowney.

David H. Erichsen, Kelly J. Voight, Matthew J. Rita, Hale & Dorr, Boston, MA, for Genrad, Inc. and Genrad Committee on Employee Benefit Plans.

## MEMORANDUM

TAURO, Chief Judge.

Plaintiff William P. Lowney ("Lowney") seeks declaratory relief to resolve a dispute concerning his retirement benefits. Presently before the court are the parties' cross-motions for summary judgment. The court must determine whether monthly retirement payments of $190.34 owed by Defendant Genrad, Inc. ("Genrad") must be paid from its pension plan account.

### I.

### Background

Genrad, a Massachusetts corporation, produces electronic circuit testing boards. Lowney worked for Genrad as an electronics assembler from November 1959 until his retirement on September 30, 1991.

In January 1989, Genrad adopted the Genrad Pension Plan (the "Plan"). The Plan sets forth conditions for determining an employee's eligibility for pension benefits. Genrad also established a pension account to pay benefits under the Plan. The Plan charges the other named Defendant, the Genrad Committee on Employee Benefits Plans, with

the obligation of administrating the Plan. The Plan is governed under the Employer Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. § 1001 *et seq* (West 1995).

In August 1990, Genrad, pursuant to the early retirement provisions in the Plan, offered eligible employees, including Lowney, a Voluntary Early Retirement Program (the "VRP"). The VRP gave these employees the option of retiring early in exchange for additional retirement benefits. Based on the Plan's early retirement formula, Lowney would have received $413.45 per month for life and for the life of his surviving spouse, as well as $500 per month for two years. Genrad required eligible employees to "elect" to participate in the VRP by signing a form by August 28, 1990.

Lowney did not sign the form by August 28, 1990 because he had some questions about participating in the VRP. He spoke with Jack Marchant ("Marchant"), who was the Director of Compensation of Benefits at Genrad. Marchant told Lowney that it would be permissible for him to sign up for the VRP after August 28, 1990. On September 21, 1990, Marchant gave Lowney a letter which answered some of Lowney's questions. One of Lowney's concerns was whether the unit in which Lowney worked was going to be sold off to another company.

A short time after receiving the September 21st letter, Lowney met with Robert E. Anderson ("Anderson"), who was the President and Chief Executive Officer of Genrad. After learning from Anderson that Lowney's unit was indeed going to be sold off, Lowney told him that he wished to participate in the VRP. Anderson responded that the election period was closed, contrary to Marchant's prior representation. Lowney then signed the VRP election form, dating it August 28, 1990, indicating his decision not to participate in the VRP.

Following his rejection of the VRP, Lowney continued to work for Genrad until his retirement in September 1991. According to the Plan's retirement formula, Lowney was entitled to receive $223.11 per month for life and for the life of his surviving spouse under the Plan's 100% contingent annuity option.

This amount was $190.34 less than the amount Lowney would have received under the VRP. Lowney complained and asked Genrad to pay him the amount he would have received under the VRP.

After negotiations, the parties signed and executed a six page integrated agreement (the "Agreement") in which Genrad promised to provide Lowney with substantially the same monetary monthly amount paid under the VRP. Specifically, Section 2 of the Agreement provides that Genrad pay Lowney:

> pension retirement payments on his 100% contingent option, leaving his past contributions in, so that Genrad shall pay Lowney the amount of $413.45 per month, with payments of $413.45 per month for his lifetime, and after his death, Genrad shall pay $414.45 per month to his surviving spouse for her lifetime.

Section 5 of the Agreement describes other benefits Lowney will receive:

> Genrad shall provide to Lowney, and his spouse, where applicable, all other retirement benefits to which he and she are entitled as he is a Genrad retiree, including, without limitation, the benefits described in the September 19, 1991 letter from Joy Gizzie, Corporate Benefits Administrator.... A true copy of said letter is attached hereto, marked "A", and incorporated herein by reference.

The Joy Gizzie letter outlines health, medical, and employee stock benefits provided under the Plan. The Agreement also provided Lowney with an additional $500 per month for the first twelve months of the Agreement.

In exchange for the payments and benefits, Lowney promised to release Genrad from all claims that he could assert against them. The Agreement also contains a confidentiality provision that penalizes Lowney for disclosing the terms of the Agreement to a third-party. If Lowney breached this provision, he would forfeit his monthly receipt of the additional $190.34.

After the parties signed the Agreement, Genrad informed Lowney that $223.11 of the $413.45 monthly amount would be paid out of the Plan's pension account, while the remain-

ing $190.34 would be paid out of Genrad's general assets. Lowney, however, did not want the $190.34 to come from Genrad's general assets because it did not offer the security of the ERISA protected pension account. Lowney asked Genrad to pay him the $190.34 from the Plan's pension account. Genrad answered that this was not possible because it would violate the terms of the Plan. To ameliorate Lowney's security concerns, Genrad offered to establish a variety of annuity plans. Lowney, however, rejected Genrad's offers.

In February 1993, Genrad tendered checks to Lowney for the then outstanding amounts in the form of $3,792.37 from the Plan's pension account and $3,235.73 from Genrad's general assets. Lowney refused the latter check and brought this suit seeking a declaration that the Agreement requires Genrad to pay him the $190.34 from the Plan's pension account.[1]

## II.

### Analysis

The court must determine whether the Agreement requires Genrad to pay the $190.34 monthly installments from the Plan's pension account. Lowney offers three alternative grounds for interpreting the Agreement as containing such a requirement: (1) the Agreement created an ERISA plan which requires Genrad to pay the $190.34 out of the Plan's pension account; (2) the Agreement either acted as an amendment to the Plan or an acceptance by Genrad to allow him into the VRP; and (3) the Agreement provides for payment from the Plan's pension account. In seeking summary judgment, Genrad contends that the Agreement cannot bear any of Lowney's interpretations.

### A. Standard for Summary Judgment

"Summary Judgment is warranted where the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine factual dispute and the moving party [is] entitled to judgment as a matter of

law." *Siegal v. American Honda Motor Co.,* 921 F.2d 15, 17 (1st Cir.1990); Fed.R.Civ.P. 56(c). Here, summary judgment rests on the proper interpretation of the Agreement.

 Under state and federal law, the interpretation of an unambiguous contract is a question of law for the court. *See Lawrence-Lynch Corp. v. Dept. of Environmental Management,* 392 Mass. 681, 682, 467 N.E.2d 838, 839 (1984); *Fashion House, Inc. v. K Mart Corp.,* 892 F.2d 1076, 1083 (1st Cir.1989). In interpreting benefits under ERISA, the court will use federal substantive law including the "common-sense" canons of contract interpretation. *Bellino v. Schlumberger,* 944 F.2d 26, 29 (1st Cir.1991). Under this scheme, the court draws from Massachusetts law to interpret the contract. *See Rodriguez-Abreu v. Chase Manhattan Bank, N.A.,* 986 F.2d 580, 584 (1st Cir.1993) ("Because state law provides the richest source of law of contract interpretation, we have incorporated state law principles in the process of developing a body of federal common law."). Basic contract interpretation mandates that "[w]here the wording of a contract is unambiguous, the contract must be enforced according to its terms." *O'Connell Management Co. v. Carlyle–XIII Managers, Inc.,* 765 F.Supp. 779, 782 (D.Mass.1991); *ER Holdings, Inc. v. Norton Co.,* 735 F.Supp. 1094, 1097 (D.Mass.1990). Guided by these principles, the court now addresses Lowney's arguments.

### B. The Agreement is not an ERISA Plan

 Lowney first contends that the Agreement creates a new and independent ERISA "plan" and that, as such, payments under the Agreement must come from the Plan's pension account. Genrad counters that the Agreement is not an ERISA plan, but merely a supplemental contractual payment that is separate and distinct from the $223.11 payable to Lowney under the Plan.

 Congress enacted ERISA to protect workers from abuses in the administra-

---

1. The court subsequently allowed Lowney to deposit the check payable from Genrad's general assets without waiving his rights.

tion of retirement and welfare plans provided by employers. *See* H.R.Rep. No. 93–533, 93d Cong. 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 4639. Toward this end, Congress sought to ensure "that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 374, 100 S.Ct. 1723, 1732, 64 L.Ed.2d 354 (1980). ERISA accomplished this purpose by establishing minimum standards for the vesting of benefits, funding of benefits, fiduciary obligations,[2] and reporting and disclosure requirements. *Id.* at 362, 100 S.Ct. at 1726.

■ ERISA recognizes two types of plans, "employee welfare benefit plans"[3] and "employee pension benefit plans."[4] Here, Lowney maintains that the Agreement created an employee pension benefit plan. Whether the Agreement constitutes a pension plan under ERISA is a question of fact, to "be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person." *Wickman v. Northwestern National Insurance Company*, 908 F.2d 1077, 1082 (1st Cir.1990), (quoting *Kanne v. Connecticut General Life Ins. Co.*, 867 F.2d 489, 492 (9th Cir.1988), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989)), *cert. denied*, 498 U.S. 1013, 111 S.Ct.

581, 112 L.Ed.2d 586 (1990). An ERISA plan exists if a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and the procedures for receiving benefits. *Wickman*, 908 F.2d at 1082.

■ The touchstone for determining the existence of an ERISA plan is whether a particular agreement creates an ongoing administrative scheme. *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 12, 107 S.Ct. 2211, 2218, 96 L.Ed.2d 1 (1987); *Simas v. Quaker Fabric Corp. of Fall River*, 6 F.3d 849, 852–853 (1st Cir.1993). Simple arithmetical calculations do not require an ongoing, particularized, administrative scheme. *Delaye v. Agripac, Inc.*, 39 F.3d 235, 238 (9th Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 1402, 131 L.Ed.2d 289 (1995). Rather, an employer's need to create an administrative system arises where the employer undertakes a host of obligations, such as determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds, and keeping appropriate records to comply with ERISA's reporting requirements. *Fort Halifax*, 482 U.S. at 9, 107 S.Ct. at 2216; *Kulinski v. Medtronic Bio-Medicus, Inc.*, 21 F.3d 254, 257 (8th Cir. 1994).

Although there is no litmus test for determining the existence of an administrative scheme, prior cases provide instruction about the parameters of this inquiry. In *Simas v.*

2. For an excellent treatise on fiduciary responsibility under ERISA, *see ERISA Fiduciary Law* (Susan P. Serota & Frederick A. Brodie eds. 1995).

3. 29 U.S.C.A. § 1002(1) provides:
The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship, or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186 of this tile (other than pensions on retirement or death, and insurance to provide such pensions).

4. 29 U.S.C.A. § 1002(2)(A) provides:

Except as provided in subparagraph (B), the terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a surrounding circumstances such plan, fund, or program—
(i) provides retirement income to employees, or
(ii) results in a deferral of income by employees for the periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

*Quaker Fabric Corp,* 6 F.3d 849 (1st Cir. 1993), the court considered whether a Massachusetts "tin parachute" statute required employers to establish an employee benefit plan. The statute mandated that employers make a one-time severance payment to employees who: (1) had worked a minimum of three years for the employer; (2) lost their job as a result of a "transfer of control" of their employer; and (3) met the eligibility standards for unemployment benefits under state law. Mass.Gen.L. ch. 149 § 183. The court concluded that the statute imposed upon employers "ongoing administrative obligations . . . of a kind and over a time period that go far beyond *Fort Halifax* to call the regime a 'plan' within the meaning of ERISA. . . ." *Simas,* 6 F.3d at 853. The court based its conclusion on the breadth of the administrative obligations, which required employers to make a case-by-case determination of each employee's eligibility based on several discrete factors. *Id.*

In *Macomber v. Digital Equipment Corporation,* 865 F.Supp. 65 (D.N.H.1994), the court examined whether an employer's severance program involved an administrative scheme. The employer employed ten people to administer the program, whose task was to determine which of the employer's 120,000 employees were qualified for the program. *Id.* at 69–70. In making the case-by-case eligibility determination the administrators followed a set of procedural guidelines that turned on whether the employee was "transitional." *Id.* at 70. The court found that the administrative obligations undertaken by the employer were "of a sufficient magnitude, duration and nature" to conclude that the severance program was an ERISA plan. *Id.*

In contrast to these employer plans involving benefits to multiple employees, the Ninth Circuit recently confronted a situation involving an employment contract with a single employee. *Delaye v. Agripac, Inc,* 39 F.3d at 237. The contract provided the plaintiff with certain termination benefits, including a fixed monthly amount based on a set formula. *Id.* The contract also gave the plaintiff accident, health, and life insurance until he found new employment. *Id.* In concluding that the contract did not create an adminis-

trative scheme, the court focused on the fact that the dispensation of these benefits did not involve discretionary decisions about the timing, amount or form of the payment. *Id.* at 237–38.

Here, the Agreement does not create the sort of scheme normally associated with the creation and maintenance of an ERISA plan as observed in *Simas* and *Macomber.* The Agreement creates no scheme for calculating benefit levels, making disbursements, monitoring the availability of funds, or keeping appropriate records to meet ERISA's reporting requirements. Rather, Genrad's promise to pay Lowney the additional $190.34 is the same sort of simple, arithmetical payment found in *Delaye.* Accordingly, the court concludes that the Agreement does not implicate an on-going administrative scheme.

Examining the Agreement against ERISA's statutory prerequisites bolsters the court's conclusion that the Agreement is not an ERISA plan. For example, ERISA requires that fiduciaries be named to control and manage the operation and administration of the plan, 29 U.S.C.A. §§ 1102(a), 1104(a); that the plan provide a method for funding the plan and set forth procedures for amending the plan, 29 U.S.C.A. § 1102(b); and that the plan's assets be held in trust, 29 U.S.C.A. § 1103(a). Here, the Agreement does not name fiduciaries, does not establish a funding scheme or a trust, and does not outline any procedures for amending the plan.

Because the Agreement does not establish an on-going administrative scheme and does not bear the marks normally associated with the creation and maintenance of an ERISA plan, the Agreement cannot reasonably be construed as anything but a supplemental contractual promise from Genrad to pay Lowney an additional $190.34 per month. Moreover, the presence of the confidentiality clause and the release provision also show the parties intent to contractually supplement Lowney's retirement and not to create an ERISA plan.

Lowney attempts to evade the clear implications of the simple terms of the Agreement by contending that the Agreement incorporates the complex administrative scheme of Genrad's Plan by reference. By doing so,

Lowney argues the Agreement subsumed all of the Plan's administrative obligations, thereby satisfying the *Fort Halifax* test. The court disagrees.

■■■ As an initial matter, it is well established that "incorporation by reference requires that the document to be incorporated be referred to and described in the contract so that the referenced document may be identified beyond doubt." *American Dredging Co. v. Plaza Petroleum*, 799 F.Supp. 1335, 1338 (E.D.N.Y.1992), *vacated in part*, 845 F.Supp. 91 (E.D.N.Y.1993); *see also Chicopee Concrete Service, Inc. v. Hart Engineering Co.*, 398 Mass 476, 477, 498 N.E.2d 121, 122 (1986) (incorporation of subcontract into contract must be clearly stated). Here, the Agreement does not contain a provision expressly incorporating the Plan. Moreover, the fact that the Joy Gizzie letter was specifically referenced and incorporated into the Agreement, demonstrates that the parties knew how to incorporate. For these reasons, the court concludes that the Agreement did not incorporate the Plan by reference. Accordingly, the court finds as a matter of law that the Agreement is not an ERISA plan.[5]

### C. The Agreement did not become part of Genrad's established ERISA Plan

Lowney next contends that the Agreement became part of Genrad's established ERISA Plan. He maintains that this occurred in either of two ways: (1) that under the Agreement he became a participant in the VRP; or (2) that the Agreement is an amendment to the Plan. If either of these interpretations were correct, the Agreement would become part and parcel of the Plan and payments would be due from the Plan's pension account.

#### 1. The Agreement did not put Lowney in the VRP

■■■ The court finds as a matter of law that it is unreasonable to characterize the Agreement as the VRP. Lowney adduces no evidence that Genrad represented the Agreement as giving Lowney the opportunity to opt back into the VRP. Furthermore, while the Agreement provided Lowney with the same amount of benefits that he would have received under the VRP, the conditions imposed by the Agreement for receiving that amount differ materially from the VRP. Under the Agreement, Lowney forfeited his right to receive the $190.34 if he breached the Agreement's confidentiality provision, whereas the $190.34 under the VRP was non-forfeitable. Moreover, the Agreement gave Lowney $500 per month for one year, while the VRP gave him $500 per month for two years. As such, the court concludes that the Agreement did not allow Lowney to become a participant in the VRP.

#### 2. The Agreement did not amend the Plan

■■■ It is also unreasonable to characterize the Agreement as an amendment to the Plan. ERISA requires that each plan provide amendment procedures and identify the persons who have authority to amend the plan. 29 U.S.C.A. § 1102(b)(3). To satisfy this obligation, the Plan includes formal amendment procedures, which provide the Genrad Board of Directors with the sole authority to amend the Plan. The Plan also requires that upon approval the changes will be delivered to the Genrad Committee on Employee Benefit Plans. The Agreement and its subsequent signing do not comport with these procedures. *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir.1986) ("By explicitly requiring that each plan specify the amendment procedures, Congress rejected the use of informal written agreements to modify an ERISA plan."); *Singer v. Black & Decker Corp.*, 769 F.Supp. 911, 918 (D.Md.1991), *aff'd* 964 F.2d 1449 (4th Cir. 1992) (alleged modifications to an ERISA plan based upon informal written agreements are unenforceable). Accordingly, the court

---

**5.** Assuming that the Agreement was a new ERISA plan, Lowney's contention that the $190.34 must come from the Plan's pension account would still fail. The pension account that Lowney wants the $190.34 to come from was established to fund Genrad's established ERISA Plan. The Agreement, as a new ERISA plan, would exist independently from the Plan. As such, Genrad's pension account used to fund the Plan would have no relevance to Genrad's payment obligations under the Agreement.

48

concludes that the Agreement did not amend the Plan.

### D. The Agreement Provides Lowney with No Right to Receive the $190.34 from the Plan's Pension Account

The final branch upon which Lowney clings is his contention that the plain terms of the Agreement gives him the right to receive the $190.34 from the Plan's pension account. Genrad contends the Agreement does not create any obligation to pay Lowney the $190.34 from the pension account.

As an initial matter, it is significant that the Agreement contains no provision that explicitly states where the monies will be drawn. In fact, there is no language whatsoever in the Agreement that creates an obligation on Genrad to pay Lowney any sums from the Plan's pension account. Moreover, Section 18 of the Agreement contains an integration clause which provides that the Agreement "is the complete and exclusive statement of the agreement between the parties." The court will, therefore, not look beyond the terms of the Agreement and inject an obligation on Genrad where the plain and unambiguous terms of the Agreement do not create such an obligation. *See, e.g., O'Connell Management Co.,* 765 F.Supp. at 782; *ER Holdings, Inc.,* 735 F.Supp. at 1097. Accordingly, the plain terms of the Agreement leave the determination of the source of Lowney's payments to the discretion of Genrad.

In contending to the contrary, Lowney looks to language in Section 2 of the Agreement, which provides that "Genrad shall pay Lowney pension retirement payments on his 100% contingent option, leaving his past contributions in, so that Genrad shall pay Lowney the amount of $413.45 per month:...." Lowney asserts that the words "pension retirement payments" means that Genrad promised to pay him one check for $413.45 per month to be drawn from the pension account. The court disagrees. The plain purpose of Section 2 is to create Genrad's obligation to pay. The provision does not speak to the source from which that obligation will be met.[6]

Reading the Agreement as leaving the determination of the source of the funds to Genrad's discretion is supported on another ground. Under Lowney's construction, the Agreement creates an independent contractual obligation to pay him monies from an ERISA protected pension account. The purpose of ERISA pension accounts is to create a secure source for satisfying workers employment benefits free from manipulation by the employer. *Nachman,* 446 U.S. at 362, 100 S.Ct. at 1726. "ERISA's writing requirement protects the plan's actuarial soundness by preventing plan administrators from contracting to pay benefits to persons not entitled to them under the express terms of the plan." *Rodrigue v. Western & Southern Life Ins. Co.,* 948 F.2d 969, 971 (5th Cir.1991). Here, if Genrad's obligation to pay Lowney the the the monies arose solely from the Agreement as a contract—as contrasted with arising from the Agreement constituting or becoming incorporated in an ERISA plan—Genrad would be tampering with the pension account in precisely the manner prohibited by ERISA.

The court will decline to adopt a construction of a contract that will render it illegal where a reasonable alternative construction is available. *Finn v. McNeil,* 23 Mass.App.Ct. 367, 371, 502 N.E.2d 557, 561 (1987) (stating that a court should adopt construction of agreement which makes it a valid and enforceable undertaking). As discussed above, such a construction is available here. The court construes Section 2 as creating an obligation on Genrad to pay Lowney $413.45, but leaving the source from which that payment will be made to the discretion of Genrad. Genrad's discretion, however, is limited with respect to the $223.11 because of Gen-

---

6. Lowney also argues that extrinsic evidence shows that Genrad agreed to pay Lowney from the pension account. Because the court finds that the contract unambiguously gives Lowney no right to receive the $190.34 from the pension account, the court will not consider this evidence. *See Savignano v. Gloucester Housing Authority,* 344 Mass. 668, 673, 183 N.E.2d 862, 866 (1962) (holding that court will only take into consideration subsequent conduct of the parties when the contract presents an ambiguity).

rad's obligation under the Plan to pay him that sum from the pension account. There is no similar pre-existing duty with respect to the $190.34 and, thus, Genrad may pay it out of its general assets.

## III.

### Conclusion

For the reasons discussed above, the court finds as a matter of law that Genrad does not have to pay Lowney the $190.34 out of its pension fund. Accordingly, Defendants' Motion for Summary Judgment is ALLOWED and Plaintiff's Motion for Summary Judgment is DENIED.