**Klaus ECKARDT, Ralph Weil, Barbara King, Ernest Mueller and Alvin Schein, Plaintiffs,**

v.

**WIEBEL TOOL CO., INC., WTC Acquisition Corp., Paul Alessandrini, Jr., Paul Alessandrini, Sr., Heinz Bauer, Jack Mangesian, The Estate of Rose K. Wiebel and Equitable Life Assurance Society, Defendants.**

**No. 94 CV 4374 (ADS).**

United States District Court,
E.D. New York.

May 27, 1997.

Edward R. Hopkins, Hauppauge, NY, for Plaintiffs.

Rieger & Walsh, Northport, NY (Leo McGinity, Esq., of counsel), for defendants Paul Alessandrini, Sr., Paul Alessandrini, Jr.

Lawrence S. Brochin, Great Neck, NY, for Defendant Jack Mangesian.

Stebel & Paseltiner, P.C. Woodbury, NY (Michael Greene, Esq., of counsel), for Defendants Estate of Rose K. Wiebel and Heinz Bauer.

Norman Tolle, New York City, for Defendant Equitable Life Assurance Company.

Wiebel Tool Company & WTC Acquisition Corp., Service made upon: Secretary of

State, Department of State, Division of Corporations, Albany, NY, No Appearance.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge:

This lawsuit, which was commenced on September 16, 1994, arises from the claims of the plaintiffs, Klaus Eckardt ("Eckardt"), Ralph Weil ("Weil"), Barbara King ("King"), Ernest Mueller ("Mueller") and Alvin Schein ("Schein," collectively the "plaintiffs"), against the defendants Wiebel Tool Company, Inc. ("Wiebel"), WTC Acquisition Corporation ("WTC"), Paul Alessandrini, Jr. ("Alessandrini Jr."), Paul Alessandrini, Sr. ("Alessandrini, Sr.," the "Alessandrini Defendants"), Heinz Bauer ("Bauer"), Jack Mangesian ("Mangesian"), the Estate of Rose K. Wiebel (the "Estate") and Equitable Life Assurance Society of the United States ("Equitable," collectively the "defendants") for retirement benefits allegedly owed pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq. and a related state law claim for intentional infliction of emotional distress. Presently before the Court are three motions for summary judgment: (1) by defendants Bauer and the Estate; (2) by Equitable; and (3) by the Alessandrini Defendants. In addition, Lawrence S. Brochin, Esq. moves to be relieved as counsel to defendant Jack Mangesian.

### I. *Background*

Plaintiffs Ralph Weil, Barbara King, Ernest Mueller and Alvin Schein are residents of Suffolk County, New York. Klaus Eckardt is a resident of Nassau County. At all relevant times, Wiebel was a New York corporation doing business in East Setauket, New York and WTC was, also a New York corporation doing business in Hauppauge, New York. According to the Amended Complaint, Mangesian and the Alessandrini defendants are, officers and principal shareholders of WTC, which purchased Wiebel in 1990. Equitable is a New York corporation with offices in New York City. The Estate of Rose K. Wiebel, Madalene W. Loheac, Executrix, is an estate filed with and under the jurisdiction of the Surrogate's Court of Suffolk County.

The plaintiffs are all former employees of Wiebel who began working for the company when it was owned by Rose K. Wiebel, her son Phillip C. Wiebel and his wife Barbara Wiebel. Phillip died in October 1984. In 1985, Rose purchase Barbara's share's in the company, In late 1985 or early 1986, Heinz Bauer, Rose's nephew, purchased a 20 percent interest i Wiebel. Rose died in November 1989. In November 1990, Baue and the Estate sold their interests in Wiebel to WTC, which was owned by the Alessandrini Defendants and Jack Mangesian. After the sale however, Bauer continued to work for Wiebel as the company's vice president until January 1992.

Eckardt began working at Wiebel on September 26, 1973 and was a "Honer Leadman" when he was discharged. Weil was hired on May 5, 1980 and was a Plant Supervisor at the time of his discharge. King was hired in April 1978 and was an Office Manager at the time she was terminated. Mueller was hired on February 2, 1972 and was a Project Engineer when he was terminated. Schein began working for Wiebel Tool on August 19, 1979 and was a Quality Control Manager at the time he was discharged. The plaintiffs were all terminated on February 5, 1993 when Wiebel ceased its operations.

During the their employment, each plaintiff became a participant in a deferred compensation plan (the "Plan") which the they contend was governed by ERISA. According to the Amended Complaint, on June 3, 1981, each of the plaintiffs entered into an agreement providing in relevant part:

> At any time after [a date that varied depending on the employee], which is hereinafter referred to as the Retirement Date, said Employee may retire from the active and daily service of the Corporation. Upon such retirement the Corporation shall pay to said Employee an annual compensation of [a specified salary depending upon the employee] for a total period of 10 years of monthly installments of [a similarly specified amount] payable upon the first business day for 120 months of each calen-

dar month beginning in the month after his retirement. If said [employee] should die after retirement but before the expiration of 10 years or 120 months from the date thereof, the Corporation will continue to make the monthly payments of [the specified amount] to the spouse [of the employee] for the balance of the 10 years or the 120 months. If spouse is not then living or if she should die before the balance of the 120 month installments have been paid, such balance of the said 120 month installments shall be paid to [his or her] children of equal shares of the survivors of them.

Am. Compl. ¶ 23. This agreement was presented to each of the plaintiffs for signature by Joseph Clymas, an Equitable Insurance agent. The Plan provided for payment to each of the plaintiffs as follows:

Klaus Eckardt:
Benefits payable beginning October 20, 2003 on a monthly basis at the rate of $7,000 per year;

Ralph Weil:
Benefits payable beginning May 17, 1995 on a monthly basis at the rate of $14,500 per year;

Barbara King:
Benefits payable beginning April 2, 2000 on a monthly basis at the rate of $8,000 per year;

Ernest Mueller:
Benefits payable beginning July 6, 1997 on a monthly basis at the rate of $18,000 per year; and

Alvin Schein:
Benefit payable beginning December 25, 1995 on a monthly basis at the rate of $14,500 per year.

Am. Compl. ¶ 25.

On June 27, 1985, a "Modification of the Agreement of June 1981" was announced by the company (the "Modification"). The Modification contained "a statement of continuance" of the Plan in the event that the corporation was sold. With respect to determining the amount of benefits, the Modification provided:

2(b) *Determination of Amount of Obligation.* The Corporation shall pay the Employee an amount which shall be determined from time to time by reference to the cash surrender value (including any accumulated dividends) of the life insurance policy or policies ("Policies") on Employee's life presently maintained and owned by the Corporation. The amount of the Corporation's initial obligation shall be an amount equal to 25% of the cash surrender value (including any accumulated dividends) of the Policies on June 1, 1985. The cash surrender value including any accumulated dividends was [a specified amount which differed in each agreement, as of] June 1, 1985. Thereafter the amount of the Corporation's obligation shall be adjusted as of June 1 of each year as follows: the percentage payable to the Employee shall increase by 5 (five) percentage points for each twelve consecutive twelve month period of employment subsequent to June 1, 1985, and the amount payable shall be equal to the result obtained by applying the new percentage to the cash surrender value (including any accumulated dividends) of the Policies on each June 1 during Employee's employment. The final amount payable to the Employee shall be determined as of the first day of June immediately preceding his date of termination.

Reply Affirmation of Edward R. Hopkins, Exh. B.

In an explanatory letter dated June 27, 1985 signed by Rose Wiebel and Barbara Wiebel, the company explained that "[i]n order to provide an appropriate measure of your vested interest, we will be using the cash surrender value (supplemented by any dividends) under a certain insurance policy or policies on your life, owned by the Company." *Id.* Exh. B–1. This letter, by its terms, provides that the Modification is intended as a "supplement[ ]" to the 1981 Agreement.

The plaintiffs allege that the Plan was fully funded by contributions made in the form of premiums paid to Defendant Equitable from 1981 through 1991, and that the insurance policies issued for them "were titled in the name of Wiebel Tool Corporation" and included the name of each employee and a "special number." Am. Compl. ¶ 21.

Prior to joining Wiebel two of the plaintiffs, Eckardt and Schein worked for another company owned by the Wiebel family, Ozone Metal Products ("Ozone"). While working for Ozone, Eckardt and Schein participated in a pension plan. According to the plaintiffs, the Wiebel Plan, outlined above, was part of an incentive for Eckardt and Schein to switch companies. Schein is presently receiving pension benefits from Ozone's successor.

The plaintiffs contend that after WTC acquire Wiebel Tool in 1990, Defendant Mangesian began harassing employees in an effort to get them to quit. His purpose was to reduce pension obligations and permit the defendants to borrow against pension plan assets. Toward this end, Mangesian sought a loan against the Plan from Equitable. In response Equitable demanded an acknowledgment from each covered employee that he or she had no rights in the life insurance policies in order to avoid any future claims based on the loan transaction.

According to the Amended Complaint, on January 23, 1991, the plaintiffs were compelled to sign statements under threat of termination or under duress, documenting that Wiebel was the owner and beneficiary of the policies with the ability to "surrender or otherwise effect the policy's cash value." The plaintiffs allege that these statements were not presented "in the form usually accepted as a modification of an agreement" in that the signatures were not notarized at the time of execution. Rather, the plaintiffs claim that these acknowledgements were illegally notarized at a later date.

Nevertheless, upon receiving these statements Equitable released pension fund assets to Mangesian as the President of Wiebel Tool in the form of loans. According to the plaintiffs, Mangesian then used these funds for his personal interests, and has not repaid the loans.

In addition, the plaintiffs claim that because policy premiums have not been timely paid, the Plan is underfunded, which will also cause them to be denied the full benefits to which they are entitled.

As set forth above, Wiebel shut down its operations on February 5, 1993, and as a result, all of the plaintiffs' were terminated. On March 12, 1993, the plaintiffs each sent a two letters to Defendant Mangesian seeking to obtain a statement of relevant information regarding their status with respect to their pension benefits. By letter dated July 16, 1993, the plaintiffs, through their attorney, sent another letter to Mangesian and the Alessandrini defendants seeking similar information. Counsel sent his second request by letter dated July 27, 1993. On September 1, 1993, a third letter was sent certified mail. No response to any of this correspondence was ever received.

Based on these events, the plaintiffs commenced this action by filing a summons and complaint on September 16, 1994. An Amended Complaint was filed on July 19, 1995 alleging the following causes of action:

1. against Magnesian and the Alessandrini defendants for failure to provide information as required under ERISA;

2. against all defendants for breach of fiduciary duty under ERISA;

3. for payment of benefits under ERISA;

4. for intentional infliction of emotional distress; and

5. for injunctive relief preventing future breaches of fiduciary duties.

As stated above, presently before the Court are three motions for summary judgment: (1) by the Alessandrini Defendants (2) by defendants Bauer and the Estate; and (3) by Equitable. In addition, Lawrence S. Brochin, Esq. moves to be relieved as counsel to defendant Jack Mangesian.

## II. *Discussion*

### A. *Summary judgment standard*

A court may grant summary judgment only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact, *Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir. 1996), and the movant is entitled to judgment as a matter of law. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court

must, however, resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion. *See Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995); *Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 (2d Cir.1990); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

According to the Second Circuit. "[s]ummary judgment is a tool to winnow out from the trial calendar those cases whose facts predestine them to result in a directed verdict." *United National Ins. Co. v. The Tunnel, Inc.,* 988 F.2d 351, 355 (2d Cir.1993). Once a party moves for summary judgment, in order to avoid the granting of the motion, the non-movant must come forward with specific facts showing that a genuine issue for trial exists. *West–Fair Elec. Contractors v. Aetna Cas. & Surety Co.,* 78 F.3d 61, 63 (2d Cir.1996); *see also Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir. 1990) (quoting Fed.R.Civ.P. 56(e)). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the non-moving party." *Liberty Lobby.,* 477 U.S. at 248, 106 S.Ct. at 2510; *see Vann v. City of New York,* 72 F.3d 1040 (2d Cir.1995).

However, mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment. *Kulak v. City of New York,* 88 F.3d 63, 70 (2d Cir. 1996). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 128 (2d Cir.1996); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). Finally, the Court is charged with the function of "issue finding," not "issue resolution." *Gallo v. Prudential Residential Servs., Ltd., Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994).

It is within this framework that the Court addresses the grounds for the present motions for summary judgment.

### B. *The defendants' motions*

Although the defendants have made three separate motions for summary judgment, some of the arguments are repetitive. Accordingly, the Court will break the discussion down by argument rather than by movant.

### 1. *Whether the 1981 Agreement and 1985 Modification constitute a Plan governed by ERISA*

Initially, Equitable argues that the 1981 Agreement and the 1985 Modification do not constitute a Plan covered by the ERISA statute. ERISA defines an "employee pension plan" generally as:

any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its terms or as a result of surrounding circumstances such plan, fund, or program—

(i) provides retirement income to employees, or

(ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,

regardless of the method of calculating the contributions made to the plan, the method of calculating benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A).

Whether an agreement constitutes an ERISA pension plan is a question of fact which must be answered in light of all surrounding circumstances from the perspective of a reasonable person. *Wickman v. Northwestern Nat'l Ins. Co.,* 908 F.2d 1077, 1082 (1st Cir.), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990); *Kanne v. Connecticut Gen. Life Ins. Co.,* 867 F.2d 489, 492 (9th Cir.1988), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989); *Lowney v. Genrad, Inc.,* 925 F.Supp. 40, 45 (D.Mass.1995). The courts will find that an ERISA plan exists where a reasonable person can "ascertain the intended benefits, a class of beneficiaries, the source of financing, and the procedure for receiving benefits." *Grimo v. Blue Cross/Blue Shield,* 34 F.3d 148, 151 (2d Cir.1994), quoting, *Donovan v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir. 1982); *Wickman,* 908 F.2d at 1082; *Lowney,*

925 F.Supp. at 45. "The touchstone for determining the existence of an ERISA plan is whether a particular agreement creates an ongoing administrative scheme." *Lowney*, 925 F.Supp. at 45, citing, *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 12, 107 S.Ct. 2211, 2217–18, 96 L.Ed.2d 1; *see Cvelbar v. CBI Illinois, Inc.*, 106 F.3d 1368, 1375 (7th Cir.1997), quoting, *Kulinski v. Medtronic Bio–Medicus, Inc.*, 21 F.3d 254, 257 (8th Cir.1994); *Simas v. Quaker Fabric Corp.*, 6 F.3d 849, 852–53 (1st Cir.1993).

■ However, "the test for deciding which employer obligations and undertakings require such a (administrative) program is opaque." *Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 76 (2d Cir.1996), citing, *Simas*, 6 F.3d at 854. Among the factors to consider when making this determination are whether the employer's undertaking or obligation requires managerial discretion in its administration, whether a reasonable employee would perceive an ongoing commitment by the employer to provide employe benefits, and whether the employer was required to analyze the circumstances of each employee's termination separately in light of certain criteria. *Schonholz*, 87 F.3d at 76 (internal citations omitted); *Cvelbar*, 106 F.3d at 1375, quoting, *Kulinski*, 21 F.3d at 257. Simple arithmetic calculations will not suffice to constitute the required administrative scheme. *James v. Fleet/Norstar Financial Group, Inc.*, 992 F.2d 463, 467 (2d Cir. 1993) (holding that where a severance plan applied to employees with different termination dates, with different eligibility for receiving payments, and where the payments had to be calculated individually and various deductions had to be made, an ERISA plan did not exist).

■ Applying these standards, the plaintiffs contend that there is' a sufficient administrative scheme to support their ERISA claims. The Court disagrees.

Initially the plaintiffs argue that the intended benefits are readily ascertainable. Indeed, the 1981 Agreement and 1985 Modification, as set forth above, specify that the benefits owed would be calculated as a function of "the cash surrender value (including any accumulated dividends) of the life insur-

ance policy or policies ('Policies') on Employee's life presently maintained and owned by the Corporation." However, in this instance the provisions of the Agreement and Modification setting forth the plaintiffs' entitlements weigh in favor of the defendants, because they constitute nothing more than a simple arithmetic calculation which is insufficient to demonstrate the existence of an ERISA plan. *See James*, 992 F.2d at 467. There is no evidence of any criteria which would be applied to determine whether benefits should be awarded. While the payments at issue are intended to continue for a period of time, "there does not appear to be anything discretionary about the timing, form or amount of the payments." *Fludgate v. Management Technologies, Inc.*, 885 F.Supp. 645, 648 (S.D.N.Y.1995), citing, *Delaye v. Agripac, Inc.*, 39 F.3d 235, 237 (9th Cir.1994), *cert. denied*, 514 U.S. 1037, 115 S.Ct. 1402, 131 L.Ed.2d 289 (1995). As a result, the Court finds that the deferred compensation plan at issue is not governed by ERISA.

This conclusion is buttressed by the fact that although the Agreement and Modification indicate how the amount of benefits received would be determined, contrary to ERISA's statutory requirements there is no appointment of a fiduciary or administrator who would "control and manage" the plan. *See* 29 U.S.C. § 1102. Rather, benefits are to be awarded based on a predetermined formula which does not require any exercise of discretion.

In reaching this conclusion the Court notes that the plaintiffs' opposing arguments do not require a contrary outcome. For example, the plaintiffs assert that this is an ERISA plan because the Agreement and Modification "gave [them] vesting rights." The plaintiffs do not however, adequately explain how these vested rights satisfy the necessary criteria set forth above, such as whether the plan requires managerial discretion in its administration, whether a reasonable employee would perceive an ongoing commitment to provide benefits, and whether the employer was required to analyze the circumstances of each employee's termination separately in light of certain criteria.

In their opposition papers, they suggest only that "other [unidentified] documents should be examined, such as those that are exhibited in this motion, in order to understand the facts and circumstances of the pension plan." At oral argument, when pressed on this issue, plaintiffs counsel relied on two exhibits attached in support of their papers. The first is an "Advanced Underwriting Bulletin" issued by Equitable's "Sales Support Department" in 1982 "for the general information of Equitable Agents." Pl. Reply Aff., Exh. I. at 9. The language contained therein and cited by the plaintiffs states:

## EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA)

It would appear that unfunded deferred compensation plans are subject to reporting and disclosure provisions of ERISA, although such requirements are minimal where the plan is for a select group of managerial or highly-compensated employees. If rank and file employees are covered, the vesting, funding, fiduciary and plan termination insurance provisions of ERISA may also apply; these provisions would not seem to apply if only managerial or highly-compensated employees are covered by the plan. It should be noted that non-qualified employee benefit plans may be subject to other provisions of ERISA, such as fiduciary and enforcement provisions and claims procedures.

*Id.* at 7.

■ The plaintiffs contend that this language demonstrates that the benefits package at issue is covered by ERISA. The Court declines to read these provisions so broadly. As stated above, this language was drafted in 1982, prior to any of the case law cited above. In addition, this language is permissive in nature, stating that "[i]t would appear" that ERISA "may" apply in certain circumstances, hardly an admission that the criteria set forth above have been satisfied. Indeed, in the Court's view, application of this general language to find that the ERISA statute governs this case would be tantamount to a finding that because Equitable's Sales Support Department issued this Bulletin, all benefits packages relating in any way

to one or more of its insurance policies must be governed by ERISA. The Court finds such a far reaching conclusion inappropriate in this case. Accordingly, the Court will not apply this language as either an admission of liability under ERISA where the other requirements, such as a necessary administrative scheme are not present.

■ Second, the plaintiffs rely on a series of tables entitled "Approximate Vesting Schedule[s]" for various years as support for the proposition that more than simple arithmetic computations are necessary to maintain the benefits plan at issue, thereby warranting application of the ERISA statute. *Id.* Exh. J. A review of these tables however, demonstrates otherwise. For example, the table for the year 1988 contains three columns. The first column is a list of nine different employees' names with what appears to be defendant Bauer's name listed twice. The second column is entitled "Cash Value Plus Dividend" and consists of monetary values. The third column is captioned "40% vesting" and contains figures which constitute forty percent of those listed in the "Cash Value Plus Dividend" column. In the Court's view, these tables represent the simple basic arithmetic calculation addressed by the Second Circuit in *James,* which are insufficient to warrant invoking the ERISA statute.

In addition to these exhibits addressed at oral argument, the plaintiffs' opposition papers cite to the June 27, 1985 letter from Rose Wiebel, for the proposition that they are beneficiaries of the life insurance policies and that other employees actually received benefits under the Plan. Again the plaintiffs fail to explain how such a situation can create the necessary administrative scheme.

[7] Finally, as to whether this is an ERISA plan, the Court notes that Equitable was responsible for initially raising this argument. However, the court finds that it applies to all defendants with equal force. Because the Agreement and Modification do not constitute an ERISA plan, the federal law raised in the Amended Complaint does not apply and this Court lacks subject matter jurisdiction in this case. *Cvelbar,* 106 F.3d at

1373; *Fludgate,* 885 F.Supp. at 649. Accordingly, the Court finds that summary judgment pursuant to Fed.R.Civ.P. 56 is appropriate as the Court is not dealing with an ERISA plan. *See James,* 992 F.2d at 467–68. Because the issue of subject matter jurisdiction may be raised sua sponte, *Cvelbar,* 106 F.3d at 1373, the Court grants summary judgment as to all defendants and dismisses the Amended Complaint for want of subject matter jurisdiction. *Fludgate,* 885 F.Supp. at 649–50.

### 2. *Statute of limitations*

Although the Amended Complaint has been dismissed for the reasons set forth above, to complete the record, the Court will also address the defendants' argument based on the statute of limitations. The plaintiffs' claims brought under ERISA are grounded in large part on alleged breaches of fiduciary duties. The statute of limitations for such causes of action is as follows:

*Limitation of actions*

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part after the earlier of—

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or,

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113.

Applying these provisions, the Court finds that the plaintiffs' breach of fiduciary duty claims are time barred. On January 23, 1991, each of the plaintiffs signed the following statement:

Please be advised that I acknowledge Wiebel Tool Company, Inc. ("Wiebel") as owner and beneficiary policy number [which

varies depending upon the plaintiff] issued by Equitable Life. Wiebel has the right to surrender or otherwise effect the policy's cash value.

Sincerely,

[Signed by each plaintiff]

In the Court's view, this statement is sufficient to give each of the plaintiff's actual knowledge that his or her alleged rights to pension benefits might be at risk by an attempt "to surrender or otherwise effect" the value of the deferred compensation without his or her approval. Accordingly, under section 1113(2), the plaintiffs had three years from the date of these statements, namely until January 23, 1994 to commence an action for breach of fiduciary duty. Because this action was not brought until September 16, 1994, the plaintiffs' breach of fiduciary duty claims are time barred. *See Martin v. Consultants & Administrators, Inc.,* 966 F.2d 1078, 1086 (7th Cir.1992).

### C. *The motion of Lawrence Brochin Esq. to be relieved as counsel for defendant Jack Mangesian*

Finally, Lawrence Brochin, Esq. moves to be relieved as counsel for defendant Jack Mangesian pursuant to Local Rule 3(c) of the General Rules of the United States District Court for the Eastern District of New York. The basis for the motion is Mangesian's failure to pay $43,146.64 in legal fees as of January 1, 1997. The defendant Mangesian does not oppose this motion. The plaintiffs also do not oppose the motion, but request that the Court consider the posture of the case in reaching its decision.

This lawsuit has been dismissed as to all defendants for lack of subject matter jurisdiction. Although defendant Mangesian did not make a motion for summary judgment, in view of the reasons set forth in this decision, the Court is permitted to determine this issue sua sponte, and does so with respect to Mangesian. Accordingly, for the reasons set forth above, this lawsuit is dismissed with respect to defendant Mangesian as well. As a result, Brochin's motion to be relieved as counsel is granted.

### III. *Conclusion*

Having reviewed the parties' submissions, and heard oral argument, and for the reasons set forth above, it is

ORDERED, that summary judgment dismissing the Amended Complaint is granted as to all defendants; it is further

ORDERED, that the motion of Lawrence Brochin, Esq. to be relieved as counsel for defendant Jack Magnesian is granted; it is further

ORDERED, that attorney Lawrence S. Brochin is directed to serve a copy of this memorandum of decision and order on the defendant Jack Mangesian by certified mail return receipt requested within five days of the date of this decision and order; and it is further

ORDERED, that the Clerk of the Court is directed to close this case.

SO ORDERED.